IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:21-cv-02520-CNS-KAS

OWNERS INSURANCE COMPANY, an Ohio corporation,

　　Plaintiff,

v.

SECURITY NATIONAL INSURANCE COMPANY, a Delaware corporation, *et al.*,

　　Defendants.

---

## ORDER

---

Before the Court is Defendant QBE Insurance Corporation's Motion to Strike Certain Opinions of Experts Damian Arguello and Brian Spano Under Fed. R. Evid. 702 (ECF No. 294), and QBE's Motion to Exclude Testimony and to Strike Opinion of Plaintiff's Expert Donald Carroll (ECF No. 295). For the reasons below, QBE's first motion to strike is GRANTED in part and DENIED in part, and QBE's second motion to strike is GRANTED.

### I.　BACKGROUND[1]

---

[1] The Court provided a detailed background of this lawsuit in its Order on Plaintiff's Motion for Leave to Amend the Scheduling Order (ECF No. 364) and in its Order on the parties competing Motions for Summary Judgment (ECF No. 367). In this Order, the Court only provides pertinent background.

1

This insurance-coverage lawsuit arises from a construction defect arbitration that commenced in March 2021 (ECF No. 322, ¶ 31). At the arbitration hearing, Plaintiff Owners Insurance Company defended Lennar Colorado, LLC—the project's general contractor and only entity sued—under a full reservation of rights (ECF No. 322, ¶ 25). In this lawsuit, Owners alleges that various subcontractors were responsible for some of the construction defects, and therefore, the subcontractors' insurers owed a duty to defend Lennar Colorado before the arbitration panel. QBE contends that its insured, Julio Herrera d/b/a Z and S Precision Framing a/k/a ZNS Precision Framing (ZNS), only performed "shim and shave" wood framing on the homes at issue (ECF No. 341, ¶ 14). ZNS was paid just $1,053.60 for its work on all four homes (ECF No. 341 at 15, 28). QBS contends that the shim and shave process is not structural in nature and therefore could not have caused the claimed defects, which QBE characterizes as foundation movement, foundation cracking, and "earth movement" (ECF No. 320, ¶¶ 22–24).[2] Owners agrees that some of the damage was caused by earth movement, but it also contends that the framing work caused both structural and cosmetic damage to the homes (ECF No. 338, ¶ 24). Thus, the Notices of Claims triggered Defendants' duty to defend (ECF No. 322 at 13).

Under Colorado case law, generally an insurer owes a duty to defend its insured when allegations in an underlying complaint against the insured state a claim which is

---

[2] The homeowners' Construction Defect Action Reform Act (CDARA) Notices of Claims described the "defects or deficiencies" as follows: (a) drywall cracks and buckling; (b) foundation wall cracks; (c) doors racked in frame; (d) out-of-level floor; (e) lack of proper isolation between doorframes and basement slab; and (f) vertical movement of foundation and/or slab (ECF No. 525-1 at 4).

potentially or arguably within the policy coverage. *See Hecla Min. Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1089 (Colo. 1991). To that end, Owners retained Donald Carroll to opine that, "based on the broad allegations in the [four Notices of] Claims, there was no way for a structural engineering expert – much less the Defendants who performed no investigation at all – to definitely know what caused the damage" (ECF No. 304 at 10). QBE moves to exclude Mr. Carroll's opinion in its entirety (ECF No. 295).

QBE also moves to strike a single sentence from Brian Spano's expert report (ECF No. 294). Owners retained Mr. Spano, an attorney, to express opinions regarding the prevailing insurance industry standards, practice, and customs to rebut Lennar Corporation's bad faith claims against Owners. But in his opinion, while opining that Owners "promptly acknowledged its additional insured obligations to Lennar," he notes that it appears "none of the carriers for any of the other subcontractors" did (*id.* at 14). Finally, QBE moves to exclude certain opinions of Damian Arguello, Lennar Corporation's bad faith expert.[3]

## II.  LEGAL STANDARD

The recently amended Rule 702 of the Federal Rules of Evidence, which governs the testimony of expert witnesses, provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's

---

[3] As explained below, in early 2023, Owners and Lennar Corporation settled their competing insurance-coverage claims. As part of the settlement, Lennar assigned its claims to Owners, including Lennar's three counterclaims asserted against SNIC, QBE, and NGIC, among other subcontractors. Owners sought leave to amend its First Amended Complaint to step into Lennar's shoes and prosecute Lennar's cross-claims against Defendants (ECF No. 309). The Court granted that motion in part (ECF No. 364).

3

> scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (as amended on Dec. 1, 2023). Where, as here, a party challenges the admissibility of an expert witness, Rule "702 imposes upon the trial judge an important gate-keeping function with regard to the admissibility of expert opinions." *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1307 (10th Cir. 2015) (citation and quotation omitted). The proponent of expert testimony bears the burden—by a preponderance of evidence—of showing admissibility. Fed. R. Evid. 702; *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

To evaluate admissibility, the Court engages in a "two-step analysis." *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022). First, the Court must decide whether the proffered expert is qualified "by knowledge, skill, experience, training, or education" to render the opinion. Fed. R. Evid. 702; *see also Roe*, 42 F.4th at 1180. Second, if the expert is sufficiently qualified, the Court must determine whether the proffered opinions are reliable. *Roe*, 42 F.4th at 1180–81. "The reliability inquiry asks whether the methodology employed by an expert is valid—that is, whether it is based on sufficient data, sound methods, and the facts of the case." *Id.* at 1181 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). The Court also evaluates whether the expert reliably applied the methodology to the facts of the case. *Id.*

4

Experience alone may provide a sufficient foundation for expert testimony, but a witness relying solely on experience must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment. The Court's "gatekeeping function requires more than simply taking the expert's word for it." *Id.* (citation and quotation omitted).

But the Court's role as a gatekeeper under *Daubert* "is not intended to serve as a replacement for the adversary system." *Id.* (quoting *United States v. 14.38 Acres of Land Situated in Leflore Cnty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)

The Court has substantial discretion to determine "*how* to perform its gatekeeping function under *Daubert*." *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019) (emphasis in original); *see also Roe*, 42 F.4th at 1180.

### III.   ANALYSIS

QBE moves to exclude certain opinions of three experts: Damian Arguello (ECF No. 294), Brian Spano (*id.*), and Donald Carroll (ECF No. 295). The Court addresses each in turn.

### A. Motion to strike certain opinions of Damian Arguello

Prior to settling its counterclaims with Owners, Lennar Corporation retained Damian Arguello, an attorney, to provide opinions and testimony "concerning the claims handling by certain insurers" in this lawsuit (ECF No. 294-1 (Arguello Report) at 1). In addition to supporting Lennar's counterclaims against Owners, Mr. Arguello's opinions also support Lennar's cross-claims against Defendants (e.g., Lennar's claim that the Subcontractors engaged in bad faith by failing to defend Lennar in the underlying arbitration). QBE challenges eight opinions by Mr. Arguello:

(1) Based on the forms listed, at least some of these policies contained additional insured endorsements, although the scope of such coverage is unclear because they pertain to scheduled persons or entities. If the endorsements had been issued on a "blanket" basis, it's possible that they may have afforded coverage to Lennar as an owner or contractor (ECF No. 294-1 at 38).

(2) The documents indicate that a dispute or uncertainty exists as to whether QBE or NGIC assumed liability for the National Farmers Union book of business that included these policies (*id.*).

(3) QBE failed to comply with industry standards in not promptly and thoroughly investigating whether Lennar is entitled to defense and indemnity. QBE's discovery responses don't demonstrate that it contacted Mr. Herrera or otherwise attempted to investigate the scope of work he and/or his company performed for Centerline and Lennar. The standard is to promptly and thoroughly investigate based on all available information. Certainly, if I can find information on Mr. Herrera, QBE can do so as well (*id.*).

(4) QBE didn't reasonably evaluate coverage or interpret its putative policy language in concluding that Lennar isn't the contemplated "owner" in the Centerline contract. Nor did QBE act reasonably and consistent with applicable standards in reaching its conclusion that, absent an additional insured endorsement expressly naming Lennar as an additional insured, Lennar had no coverage as an additional insured under the ZNS policies (*id.*).

(5) QBE failed to attempt to reconstruct its policies to perform a prompt and thorough coverage evaluation. The declarations pages contain the form numbers pertinent to the policies, enabling an insurer to reconstruct a policy even if the original wasn't retained physically or imaged electronically (*id.* at 38–39).

(6) QBE's conclusions that ZNS's allegedly defective work didn't cause the Claimants' alleged property damage is unreasonable. First, if QBE bases this contention strictly on a reading of the Burg Simpson letters or the arbitration demands, QBE is reading those "suits" too narrowly, not applying the exceedingly broad duty to defend framework. If QBE is basing its conclusion on the facts developed at arbitration, it's not considering the facts actually developed showing that framing was implicated, and not considering that the arbitrators didn't conclude with specificity the precise causes of the Claimants' resultant damages or the extent to which any one defect contributed to those damages (*id.* at 39).

(7) QBE's conclusions are premature and not well grounded in either the "pleadings" or the facts presented at the arbitration hearings. Nor does QBE comply with the standard of explaining all the bases in fact, law, and policy language for denying coverage (*id.*).

(8) QBE hasn't adhered to the standards of promptly, thoroughly, and fairly investigating and evaluating Lennar's claim to defense and indemnity benefits under the ZNS policies (*id.*).

QBE presents three arguments for striking Mr. Arguello's opinions, which the Court addresses in order below.

### 1. Mr. Arguello's claim-handling opinions

QBE first challenges Mr. Arguello's purported claim-handling opinions (Opinions #3–8). According to QBE, these opinions are based solely on post-litigation conduct and should be excluded under Federal Rule of Evidence 403 (ECF No. 294 at 7).

"An insurer has a legal obligation to deal with an insured fairly and in good faith." *Parsons ex rel. Parsons v. Allstate Ins. Co.*, 165 P.3d 809, 815 (Colo. App. 2006). An insurer's "duty of good faith and fair dealing continues unabated during the life of the

7

insurer-insured relationship, including through a lawsuit or arbitration between an insured and the insurer." *Masters v. Safeco Ins. Co. of Am.*, No. 20-CV-00631-PAB-NRN, 2021 WL 4317112, at *7 (D. Colo. Sept. 23, 2021) (quoting *Sanderson v. Am. Fam. Mut. Ins. Co.*, 251 P.3d 1213, 1217 (Colo. App. 2010)); *see also Parsons*, 165 P.3d at 815 ("[T]he tort of bad faith breach of an insurance contract encompasses all of the dealings between the parties, including conduct occurring after the arbitration procedure." (citation and quotations omitted)).

The Court makes following rulings with regard to the claim-handling opinions:

*Opinion #3*: The Court will permit Mr. Arguello to testify, consistent with his expertise in the insurance industry, about the relevant insurance industry standards concerning an insurer's duty to investigate claims, including whether QBE's conduct was consistent with that of a reasonable insurer. Such testimony, although not required, is common and permissible. *Masters*, 2021 WL 4317112, at *7; *Peden v. State Farm Mut. Auto. Ins. Co.*, 841 F.3d 887, 890 (10th Cir. 2016); *O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 929 (D. Colo. 2017); *Goodson v. Am. Standard Ins. Co. of Wisconsin*, 89 P.3d 409, 415 (Colo. 2004). QBE's motion to strike Opinion #3 is denied.

*Opinions #4, #5, #6, and #8*: Consistent with its ruling on Opinion #3, Mr. Arguello is permitted to testify about the relevant insurance industry standards, including QBE's obligation, if any, to reconstruct certain policies as part of its investigation. However, as explained more fully below, Mr. Arguello may not testify about the "reasonableness" of QBE's claims-handling process.

*Opinion #7*: The Court will strike the first sentence of Opinion #7 as an

impermissible legal conclusion, but it declines to strike the second sentence. Mr. Arguello may opine on the relevant industry standards and explain how a reasonable insurer should act in similar situations. He may also testify, in his opinion and as a factual matter, whether QBE's conduct was consistent with those standards.

2. Ultimate issue and legal conclusions

QBE next argues that all eight opinions are impermissible legal conclusions (ECF No. 294 at 10). With limited exception, the Court disagrees.

Federal Rule of Evidence 704(a) expressly permits an expert to testify about an ultimate issue of fact. But that testimony must be helpful to the jury. Fed. R. Evid. 702. To ensure testimony is helpful, "[a]n expert may not state legal conclusions drawn by applying the law to the facts, but an expert may refer to the law in expressing his or her opinion." *United States v. Richter*, 796 F.3d 1173, 1195 (10th Cir. 2015) (quoting *United States v. Bedford*, 536 F.3d 1148, 1158 (10th Cir. 2008)). "The line between a permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern." *Id.* (quoting *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006)).

The Court makes following rulings:

*Opinion #1*: Mr. Arguello's first opinion merely opines that some of declaration pages contain additional insured endorsements, "although the scope of such coverage is unclear because they pertain to scheduled persons or entities" (ECF No. 294-1 at 38). He goes on to opine that, "[i]f the endorsements had been issued on a 'blanket' basis, it's possible that they may have afforded coverage to Lennar as an owner or contractor" (*id.*). The Court agrees with QBE that this opinion is not the definition of clarity, but it disagrees

with QBE that he does not provide "any basis" for his opinion or that he failed to "cite to any specific facts" in forming his opinion (ECF No. 294 at 12). Indeed, Mr. Arguello indicates in the paragraph immediately preceding the challenged opinion that he reviewed "declarations pages for policies that National Farmers Union issued to Julio Herrera dba Z and S Precision Framing, effective 10/26/13-10/26/14, 10/26/14-10/26/15, 10/26/15-10/26/16, 10/26/16-10/26/17, 10/26/17-10/26/18, 10/26/18-10/26/19, containing CGL coverage" (*id.*). Accordingly, the Court will not exclude this opinion as an impermissible legal conclusion. *See Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988) (testimony permitted where the expert's "opinion focused on a specific question of fact").

*Opinion #2*: Mr. Arguello opines in his second opinion that there is a dispute "as to whether QBE or NGIC assumed liability for the National Farmers Union book of business that included these policies" (*id.*). Although there may have been a dispute when Mr. Arguello authored his opinion, QBE has now affirmatively assumed liability, if any, for the policy at issue (*see* ECF No. 367 at 5 (dismissing NGIC from this lawsuit after QBE affirmatively verified that it is financially responsible for the policy described in the declaration pages it disclosed and any liability on behalf of ZNS)). Because this fact is no longer in dispute, its probative value is substantially outweighed by the potential of confusing the jury and wasting time, including the needless presentation of cumulative evidence. *See* Fed. R. Evid. 403. The Court will therefore exclude Opinion #2.

*Opinions #3 through #8*: As explained above, the Court will permit Mr. Arguello to testify, consistent with his expertise in the field of insurance, about the relevant insurance industry standards concerning an insurer's duty to investigate claims, and whether QBE's

10

conduct was consistent with industry standards. However, Mr. Arguello may not testify that "QBE [did] not act reasonably" or whether QBE's conclusions were "unreasonable" (*see* Opinions #4, #6, and #7). That type of testimony will invade the province of the jury, where, as here, the jury will be tasked with evaluating the reasonableness of QBE's conduct. It is therefore improper. *See O'Sullivan*, 233 F. Supp. 3d at 928 (an "expert witness's testimony may not usurp the jury's fact-finding function").

### 3. Mr. Arguello's experience concerning insurance underwriting or insurance policy procurement

Finally, according to QBE, reconstituting insurance policies requires specialized expertise "to know where and how to locate the subject forms" (ECF No. 294 at 13–15). QBE therefore challenges Mr. Arguello's first and fifth opinions because, QBE argues, he lacks the requisite experience to opine on insurance underwriting or insurance policy procurement (*id.*). The Court is not persuaded.

QBE relies solely on *Alabassi v. T.I.B. Ins. Brokers, Inc.*, 825 Fed. App'x. 593, 597 (10th Cir. 2020) for support. *Alabassi*, however, does not help QBE. That case supports the unexceptional proposition that expert testimony often is required in insurance cases. *Id.* (explaining that "the coverage selection form at issue contains terms specific to the insurance industry that are *outside the knowledge of ordinary persons*" (emphasis added)); *id.* at 596–97 ("An ordinary person would neither understand how a reasonably prudent insurance broker would determine the proper policy for a client nor whether TIB's conduct was consistent with those practices.").

In terms of insurance industry knowledge, as Owners rightfully points out, Mr. Arguello is not an "ordinary person"; he has worked in the insurance field since 1991 (ECF

No. 294-3 at 14). Although he may not have specific underwriting or insurance procurement experience, QBE offers no authority that such training or experience is required. Nor does it tell the Court what type of qualifications purportedly are required. QBE is free to attack Mr. Arguello's experience and opinions through "[v]igorous cross-examination" and "presentation of contrary evidence," *Daubert*, 509 U.S. at 596, but the Court will not exclude his opinions on this basis.

### B.     Motion to strike one opinion of Brian Spano

Owners brought an unjust enrichment claim against Lennar Corporation and asked the Court to declare that Lennar Corporation was required to reimburse Owners for certain fees and costs Owners incurred in defending and indemnifying Lennar Colorado at arbitration (ECF No. 1; ECF No. 161 at 21–22). Lennar, in turn, filed counterclaims against Owners for breach of contract and common law and statutory bad faith, and cross-claims against the Subcontractor Insurers for breach of contract for their failure to defend and common law and statutory bad faith (ECF No. 68).

Owners retained Brian Spano, an attorney, to opine that Owners acted in good faith when defending Lennar Colorado in the underlying arbitration. But in April 2023, Owners and Lennar Corporation reached an agreement in principle to settle their dispute (ECF No. 309 at 6). Owners now states that it "is not at all clear that Mr. Spano will testify," but it nonetheless opposes QBE's motion to strike the single sentence at issue (ECF No. 305 at 12).

QBE moves to strike the following sentence from Mr. Spano's report:

> While Owners promptly acknowledged its additional insured obligations to Lennar, it appears none of the carriers for any

12

> of the other subcontractors on the Project did so, notwithstanding the contractual obligation set forth in the Master Subcontractor Agreements and the apparent trigger of coverage with regard to the framing work performed by the Centerline Subcontractors.

(ECF No. 294-2 at 14). QBE argues this opinion is an inadmissible legal conclusion (ECF No. 294 at 10, 12–13). Owners appears to miss the point of QBE's argument, stating that "Defendants argue that Mr. Spano's opinion is unreliable because it is not supported by sufficient facts or data" (ECF No. 305 at 16).

"An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). But an expert witness's testimony may not usurp the jury's fact-finding function by telling it how to decide the case. *See Specht*, 853 F.2d at 808. It also cannot "state legal conclusions." *Phillips v. Calhoun*, 956 F.2d 949, 952 (10th Cir. 1992). And where the "ultimate issue is a question of law, the opinion of a legal expert, even a lawyer, interferes with the judge's role as 'sole arbiter of the law' and should not be allowed." *Wollan v. U.S. Dep't of Interior, Bureau of Land Mgmt.*, 997 F. Supp. 1397, 1403 (D. Colo. 1998) (quoting *Specht*, 853 F.2d at 807).

Here, a remaining central issue is whether Defendants had a duty to defend Lennar Colorado at the underlying arbitration. "Whether a duty to defend against a particular claim exists is a question of law." *RMHB Constr., Inc. v. Builders Ins. Grp.*, 348 F. Supp. 3d 1093, 1099 (D. Colo. 2018). Therefore, if Mr. Spano's opinion is that Defendants owed a duty to defend Lennar, it must be excluded. *See Specht*, 853 F.2d at 807; *Wollan*, 997 F. Supp. at 1403.

Mr. Spano first states that "Owners promptly acknowledged its additional insured obligations to Lennar" (ECF No. 294-2 at 14). Whether Owners "promptly" defended Lennar is no longer at issue in this case, and the Court will not exclude this portion of this testimony. However, the second part of the challenged opinion goes to the issue of whether Defendants had a duty to defend, and whether Defendants breached that duty. This portion of his opinion must be excluded.[4]

Accordingly, QBE's motion to exclude Mr. Spano's opinion is GRANTED in part and DENIED in part.

### C. Motion to strike testimony and opinion of Donald Carroll

According to Owners' Supplemental Rebuttal Expert Disclosure, Donald Carroll, is an "expert in the field of structural engineering" (ECF No. 295-1 at 2). Owners retained Mr. Carroll to "opine on whether or not the Notices of Claim included sufficient information to make a final determination as to the wood framing being a contributing factor to the alleged distress" (ECF No. 295-2 at 1 (Carroll Report)). After quoting the alleged issues identified in the Notice of Claims, Mr. Carroll provides a single-paragraph opinion:

> Based on the descriptions in the Notice of Claims, there was no alleged defect at the Whittaker Residence that could potentially be related to the wood framing; however, the other three residences contain alleged defects that could be attributable to the wood framing. Out-of-level floors, which referred to the framed floors, could be attributable to multiple issues including the wood framing installed by Centerline and/or its subcontractors. Similarly, cracks and buckling in the

---

[4] To be clear, Owners retained Mr. Spano to opine on the "prevailing insurance industry standards, practice and customs applicable to the issues presented" in this lawsuit (ECF No. 294-2 at 1). Unless cumulative to Mr. Arguello's testimony, Owners may call Mr. Spano to testify as to the applicable insurance industry standards. Such testimony, although not required, is common and permissible. *Peden*, 841 F.3d at 890; *O'Sullivan*, 233 F. Supp. 3d at 929; *Goodson*, 89 P.3d at 415 ("The aid of expert witnesses is often required in order to establish objective evidence of industry standards.").

>gypsum board finishes, as well as doors racked in their frames, could also be attributable to multiple causes, including the wood framing installed by Centerline and/or its subcontractors. The traditional method used to determine, to a reasonable degree of engineering certainty, whether or not deficient framing played a role in the alleged distress is to have a licensed design professional investigate the as-built conditions. If no such investigations were performed, it is unclear how a determination as to causation, partial or in whole, could be reached. In our experience in the Front Range of Colorado, framing deficiencies can cause drywall cracking/buckling, racked doors, and out of level floors, and can play a contributary role in distress within the building that has experienced foundation movement. Therefore, while it is generally not the primary causation, the framing which includes both structural and non-structural components cannot always be ruled out as a contributing cause, and certainly not in the Notices of Claim I reviewed. Lastly, as no time frame for the previously mentioned damage was set forth in the Notices of Claim, one cannot determine if all specific locations of distress occurred during or after.

(*id.* at 2). QBE moves to strike the entire opinion (ECF No. 295 at 5).

The parties seem to agree that Mr. Carroll is qualified to opine on matters related to structural engineering. And there's little doubt that Mr. Carroll's proffered testimony is relevant to Owners' claims and QBE's defenses. The only issue to resolve is whether his testimony is reliable. The Court finds that it is not.

Mr. Carroll's opinion does not provide specific data or articulate the methodology he employed. Although he provides a list of "pertinent documents" that he reviewed, he does not reference any documents in his report other than the Notices of Claims. And although he states that the "traditional method used to determine, to a reasonable degree of engineering certainty, whether or not deficient framing played a role in alleged distress

15

is to have a licensed design professional investigate the as-built conditions," he admits that the did not visit any of the homes at issue (*id.* at 1–2).

Owners correctly points out that the "reliability inquiry asks whether the methodology employed by an expert is valid—that is, whether it is based on sufficient data, sound methods, and the facts of the case" (ECF No. 304 at 4 (quoting *Roe*, 42 F.4th at 1181)). But Owners does not identify what methodology, if any, Mr. Carroll employed. The closest Owners comes is arguing that "Mr. Carroll's theories can be tested by Defendants' forensic engineering expert, Mr. Stanley Stoll . . . . Mr. Carroll's methodologies and the data used to form the opinions can be replicated/tested by Mr. Stoll" (*id.* at 5). But again, Mr. Carroll does not disclose the theories or methodologies, if any, that he used. Nor does Owners identify the data considered by Mr. Carroll. Owners' primary, if not only, argument is that Mr. Carroll "rel[ied] on his two decades of experience" in reaching his opinion (*id.* at 7). That is not enough.

Owners bears the burden of showing that Mr. Carroll's opinions are reliable.[5] Although experience alone might have provided a sufficient foundation for Mr. Carroll's testimony, he failed to "explain how that experience le[d] to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment.

---

[5] Contrary to Owners' argument (ECF No. 304 at 7), this Court's opinion in *Banks v. Munir* does not support Owners' position. In that opinion, this Court restated the familiar legal standard that, although an expert may rely solely on experience, the "witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Banks v. Munir*, No. 120CV03729-CNS-MDB, 2023 WL 2914811, at *7 (D. Colo. Apr. 12, 2023) (quoting *Nacchio*, 555 F.3d at 1258). And there, unlike here, the neurologist adequately explained how his forty years of practicing medicine led to his conclusions. *See id.* at *7–8.

Indeed, he only references his experience once, stating that, "[i]n our experience in the Front Range of Colorado, framing deficiencies can cause drywall cracking/buckling, racked doors, and out of level floors, and can play a contributary (sic) role in distress within the building that has experienced foundation movement" (ECF No. 295-2 at 2). He again does not explain how that experience led to his conclusions. (He also does not explain who "we" is.) The Court cannot simply take the expert's word for it.

Accordingly, the Court finds that Mr. Carroll's opinions are not sufficiently reliable and are therefore excluded.

## IV.  CONCLUSION

QBE's Motion to Strike Certain Opinions of Experts Damian Arguello and Brian Spano Under Fed. R. Evid. 702 (ECF No. 294) is GRANTED in part and DENIED in part, and QBE's Motion to Exclude Testimony and to Strike Opinion of Plaintiff's Expert Donald Carroll (ECF No. 295) is GRANTED.

DATED this day of 9th day of February 2024.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge